FILED

March 6, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

IN THE COURT OF APPEALS OF TENNESSEE

JULIE HARLAN, Individually      :      SULLIVAN LAW
and as Next Friend of           :      CA No. 03A01-9509-CV-00311
JAMES K. HUNT, II, a minor      :
                                :
     Plaintiffs-Appellees       :
                                :
vs.                             :
                                :
JAMES F. LOVETT                 :
                                :
     Defendant-Appellant        :


and                                    HON. RICHARD LADD
                                       JUDGE

SONJA BLACKBURN                 :
                                :
     Plaintiff-Appellee         :
                                :
vs.                             :
                                :
JAMES F. LOVETT                 :
                                :
     Defendant-Appellant        :      AFFIRMED AND REMANDED




BURKETT C. McINTURFF, OF KINGSPORT, TENNESSEE, and
SHELBURNE FERGUSON, JR., OF KINGSPORT, TENNESSEE,
FOR APPELLANT

JOSEPH F. HARRISON, WITH HARRISON & KENNEDY, OF BRISTOL,
TENNESSEE, FOR APPELLEES JULIE HARLAN AND JOHN K. HUNT, II

DAVID S. BUNN, WITH MASSENGILL, CALDWELL, HYDER & BUNN, OF
BRISTOL, TENNESSEE, FOR APPELLEE SONYA BLACKBURN

O P I N I O N

Sanders, Sp.J.

The Defendant has appealed from a jury verdict awarding compensatory and punitive damages for his conversion of seven saddle horses.

In May, 1992, the Plaintiff-Appellee, Julie Harlan and Defendant-Appellant James F. Lovett entered into an oral lease agreement whereby Mr. Lovett leased to Ms. Harlan a tract of farm land containing approximately 83 acres located in the 5th Civil District of Sullivan County. The lease was on a month-to-month basis for which Ms. Harlan was to pay $275 per month in advance. The land was fenced and had a barn located on it. Ms. Harlan was to have the use of the barn and was to make necessary repairs to the fence. She owned five horses and a pony. Her minor son, James K. Hunt, II, owned a joint interest with her in one of the horses. At the time the lease was entered into Ms. Harlan stated her purpose in leasing the property was for breeding, raising, and training jumping horses.

Ms. Harlan paid her first month's rent in advance on May 27 when she made her lease with Mr. Lovett but there were delays in the payment of the June, July, and August rents. She paid the rent for these months except for $25 on the August rent and she did not pay any rent after the partial payment for August.

2

Immediately after signing the lease agreement, Ms. Harlan moved her five horses and the pony onto the property. Approximately a month later the Plaintiff-Appellee, Sonja Blackburn, with the consent of Ms. Harlan, but without the knowledge of Mr. Lovett, moved two of her saddle horses onto the property. Although Mr. Lovett was aware of the fact that two additional horses had been placed on the property, he assumed they belonged to Ms. Harlan or members of her family.

After Ms. Harlan stopped paying rent on the property, Mr. Lovett called her on the telephone requesting payment. She promised to get back in touch with him, but never did. On October 27, 1992, he wrote her a certified letter stating he would turn the matter over to his attorney if she did not pay her rent within five days. She did not respond. Also, by October most all the grass on the property had been grazed off by the horses and they began breaking through the fence on the property, apparently in search of food. They were getting on the property and into the fields of adjoining property owners as well as on the greens and fairways of Rock Creek Golf Course, which was located nearby, and damaging the golf course.

Mr. Lovett continued his efforts to establish communications with Ms. Harlan. He called her residence but she would not return his calls. It reached the point where he would call and when his voice was apparently recognized, the party would "hang up." Mr. Lovett did not know Ms. Blackburn nor did he know two of the horses belonged to her, so she was never called. Ms. Blackburn testified she made her arrangements with Ms. Harlan and not Mr. Lovett to put her

horses on Mr. Lovett's property.  The record also shows that, although Ms. Blackburn fed her horses regularly, by December, 1992, the horses belonging to Ms. Harlan had become so poor and emaciated "you could count their ribs."

Mr. Lovett testified he was fearful he would be liable for damages which might be caused by the horses to other properties, both private and public.  He was fearful they might injure some child or other person or they might get on the highway and be involved in an accident.  He further contended he had concluded that, since Ms. Harlan would not return his calls and the horses had gotten in such poor condition, she had decided to abandon them, and he decided to send them to the stockyard for sale.  He called Mr. Dennis Widener, who hauled livestock and told him he had some horses for sale and asked him to take them to the stockyard.  Mr. Widener went to the premises and Mr. Lovett sold them to him for $1,200.  Mr. Widener picked the horses up on December 2, 1992, and took them to the stockyard where he sold them for $1,750.

After the horses had been taken to the stockyard and sold by Mr. Widener, Ms. Blackburn went to the premises where the horses had been kept and discovered they were missing. Ms. Blackburn reported to Ms. Harlan the horses were missing and Ms. Harlan gave her Mr. Lovett's telephone number and suggested she call him, which she did.  Mr. Lovett told her he had sold the horses to Mr. Widener.  Ms. Blackburn, in turn, called Mr. Widener and then went to the stockyard in search of the horses, but they could not be located.  Some two or three weeks later, the pony and one of the horses belonging to Ms.

4

Harlan were located and returned to her. In the interim, Mr. Lovett deducted $850 for rent from the $1,200 which he had gotten from the sale of the horses and sent Ms. Harlan a check for the balance.

Ms. Blackburn and Ms. Harlan each filed separate suits against Mr. Lovett. Ms. Harlan also brought suit on behalf of her infant son, James K. Hunt, II, who was co-owner with her of one of the horses. The Plaintiffs alleged in their complaints that the Defendant, by selling their horses, had wrongfully converted them to his own use and benefit. They each asked for compensatory and punitive damages and demanded a jury to try the cause.

The Defendant, for answer, filed a general denial of the allegations in the complaints. As an affirmative defense, he alleged that the Plaintiffs' failure to keep their animals within the confines of the fence and letting them run at large subjected him to damages.

An agreed order of consolidation of the cases for trial was entered and after pretrial depositions were taken the Plaintiffs each filed motions for partial summary judgment on the issue of liability pursuant to Rule 56, TRCP. In support of the motion, they relied upon the pleadings, the affidavits of the Plaintiffs, and the deposition of the Defendant.

The Defendant filed a response to the motions for summary judgment denying the Plaintiffs were entitled to summary judgment because there were genuine issues of material

facts for trial. He also filed an affidavit in support of his response.

The affidavits of the Plaintiffs stated they were the respective owners of the horses. They had not given the Defendant permission to sell their horses and they did not know they were going to be sold.

In Mr. Lovett's deposition, he admitted he sold the horses to Mr. Widener for $1,200 and he was not the owner of the horses.

Upon the hearing, the court found there was no genuine issue as to the material facts concerning conversion of the horses, and sustained the motions for summary judgment.

Upon the trial of the case, the court instructed the jury he had previously held the Defendant was liable for damages and it was their duty to determine the amount of those damages.

As pertinent, Ms. Blackburn testified one of her horses was a 14-year-old thoroughbred quarter horse which had won a number of ribbons as a show horse and was worth $5,000 on December 2, 1992, the day he was sold. Her other horse was a dappled gray Arabian saddlebred cross four years old, who had a lot of training and had a value of $10,000 at the time he was sold.

Ms. Harlan testified as to the value of the five horses she had on the farm at the time they were sold and

6

listed them by their names as follows:  Tiny - a dappled gray registered English Shire stallion, $13,500; White Oak - a thoroughbred two-year-old quarter horse, $8,000; Chesty - a 14-year-old crossbred brood mare, $3,000; Black Star - a nine-month-old filly, $5,000; Valor - a young horse owned jointly with her son, $2,500, for a total of $32,000.

There was considerable disagreement among the witnesses as to the physical condition of Ms. Harlan's horses on the date of sale.  She testified they were in good condition at the time she last saw them two days before they were sold.  Other witnesses who saw them shortly before the sale and those who saw them on the date of the sale testified they were in very poor condition.  The Defendant introduced a picture of Tiny, the registered stallion, which was made after the sale. It depicted him in extremely poor condition, having lost about 50% of his normal weight.  A veterinarian testified his condition was the result of starvation.  Ms. Harlan insisted this weight loss had occurred during the two or three weeks between his sale and when he was returned to her.  Other witnesses testified that was his condition at the time of the sale.

At the close of Plaintiffs' proof, Defendant moved for a directed verdict as to the complainant's claim for damages for the loss of Tiny, the registered Shire stallion, because she had reclaimed the horse and had offered evidence only as to his value as of the date of the sale.

The court overruled the motion and over Defendant's objection permitted counsel for the Plaintiff to recall Ms.

7

Harlan to testify as to the difference in the value of the horse between the date of sale and the date she recovered him.

On recall, Ms. Harlan testified that on the date of sale he had a value of $13,500; when he was returned he had a value of $7,000.

At the conclusion of all the proof, the court again charged the jury he had found the Defendant liable in damages to the Plaintiffs and it was their duty to fix the amount of damages. The jury was given special verdicts to fix the amount of compensatory damages for the conversion of each horse. They were also asked to say "yes" or "no" to the question of whether by clear and convincing evidence the Defendant was liable for punitive damages. Upon consideration of the issue of punitive damages, the jury found the Defendant liable for punitive damages in the following amounts: To Ms. Harlan $10,000, to John K. Hunt, II, $50, and to Ms. Blackburn $3,500. Judgments were entered in keeping with the jury verdict.

The Defendant filed a motion for a new trial, which was overruled, and he has appealed, presenting the following issues for review: 1. "Did the trial court err when it entered summary judgment for the Plaintiffs against the Defendant finding that the Defendant converted the horses of the Plaintiffs when in fact and law the Defendant had a lien on said horses for his rental for pasturage?" 2. "Was the charge to the jury as presented by the trial court stated in language that was at such an elevated educational level that a jury of average intelligence would be unable to comprehend and

8

follow its instructions all to the detriment of the Defendant in this case?" 3. "Did the trial court err in charging the jury regarding the proper measure of damages when the trial court failed to explain how the jury could determine fair market value as opposed to diminution of value?"

We find no reversible error in any of the issues presented, and affirm for the reasons hereinafter stated.

In support of Appellant's insistence that the court was in error in holding he had converted the horses when, in fact, he had a lien on the horses for rental pasture, he relies upon TCA § 66-20-101 which provides:

> **Pasturage lien.**-- When any horse or other animal is received for pasture for a consideration, the farmer shall have a lien upon the animal for the farmer's proper charges, the same as the innkeeper's lien at common law; and in addition the farmer shall have a statutory lien for six (6) months.

The Appellant, in his brief, presents a persuasive argument, supported by good authority, that the holder of a lien under the statute quoted above has priority over the owner of the property. Under the facts in the case at bar, however, the reliance by the Appellant upon the statute is misplaced. The Appellant did not "receive to pasture for a consideration" the horses of the Plaintiffs. He leased his 83-acre tract of land to the Plaintiff, Ms. Harlan, for her to breed, train, feed and pasture her horses.

There is another compelling reason, however, why the Appellant cannot prevail on this issue. He did not raise this issue in the trial court and raises it for the first time on

9

appeal, which cannot be done.  **Thomas v. Noe**, 42 Tenn.App.
234, 301 S.W.2d 391 (1956: **Tops Bar-B-Q, Inc. v. Stringer**,
Tenn.App., 582 S.W.2d 756 (1977) **Moran v. City of Knoxville**,
Tenn.App., 600 S.W.2d 725 (1979); **Harrison v. Schrader**, Tenn.,
569 S.W.2d 822 (1978).


Issues 2 and 3 in the Appellant's brief relate to
the content of the court's charge and were both raised for the
first time in the Appellant's motion for a new trial.  They
will be considered together.


The second issue avers that the language of the
court's charge to the jury was elevated to an educational
level above what an average juror could comprehend and
understand.  Apparently, because of the unique nature of
Appellant's objection to the charge, the court entered an
order permitting the Appellant to supplement the record with
the deposition of Dr. John Taylor, a professor in the College
of Education at East Tennessee State University with a
specialty in reading education.


We have very carefully considered the testimony of
Dr. Taylor and find it persuasive.  We find it enlightening on
ways our usual complicated charges to a jury could be improved
insofar as being more intelligible and understandable to the
average juror.  Dr. Taylor testified he had read the court's
charge and had analyzed it for readability.  Excerpts from his
testimony are as follows:

"A.      I applied a variety of readability formulas to
it...and I obtained results that varied somewhat from formula
to formula and from passage to passage, but the general

conclusion is that it's a very difficult piece of material to -- linguistically. I compared it to the results of the same formulas applied to textbooks used in our College of Medicine for first year medical students, and it's approximately the same level of difficulty as the textbooks that med students use.

"Q.        Is there a way to say what grade level that this charge might be read at?

"A.        Approximately, the college graduate level. ....

"Q.        What do readability formulas look to, to determine whether something is able to be comprehended?

"A.        There are a number of variables depending upon the specific formula, but the two most common variables are word length and sentence length.  Polysyllabic words are more difficult than monosyllabic words; longer sentences are more difficult than shorter sentences. .... [A]nd some of them include other variables, such as number of personal pronouns makes readability easier.  In a couple of formulas, there are actual lists of words to be considered easy words.  Other words...are considered to be difficult words. ...[A]problem with readability difficulty is that it doesn't provide total information in terms of the conceptual variables involved. They do not indicate the difficulty caused by lack of common concepts between the person presenting the material and the person receiving it.

Q.        ....

A.        A number of concepts involved in this document [the court's charge] would be difficult and unfamiliar to most of us who are not in this field.

"Q.        In regard to this specific charge, are there ways that this charge could be presented that would be more

11

readable or more comprehensive -- comprehended by individuals that you find on an ordinary jury?

"A.      ....I would judge that it could be re-presented in simpler language.

"Q.      ....

"A.      It would take both knowledge of the legal elements involved and knowledge of the language.

"Q.      Specifically....

"A.      Shorter, less complicated sentences.  And if there were some way to make the entire document -- the entire charge briefer, it would be of great benefit."

We find Dr. Taylor's testimony interesting and enlightening but, under the law applicable to the case at bar, we cannot say there is reversible error.

In Appellant's third issue he says the court, in its charge to the jury, "failed to explain how the jury could determine fair market value as opposed to diminution of value."  The basis for this insistence by the Appellant is the fact that out of the seven horses sold on December 2, one of them was recovered by the owner on December 19.  Ms. Harlan, the owner of the horse, testified the value of the horse was $13,500 on the day he was sold.  She later testified his value when she recovered him was $7,000.  In his charge on this issue, the court charged the jury as follows:  "Now, as I said earlier, I already found liability by the Defendant to the Plaintiffs for the compensatory damages.  This is for damage to Plaintiffs' property.  If the horses were taken and not returned, the measure of damages is the fair cash market value of the horses as of December 2nd, 1992.  If the horse was

12

returned, the measure of damage is the reduced market value, if any, of the horse as a result of the conversion in December, 1992. In other words, the measure of damages would be the difference in value of the horse at the time it was taken and at the time it was returned, if there was any difference."

In the case of **Mitchell v. Smith**, 779 S.W.2d 384, 390 (Tenn.App.1989), as pertinent, the court said:

> The trial court's instructions are the jury's only proper source of the legal principles to guide its deliberations. **State ex rel. Myers v. Brown**, 209 Tenn. 141, 148-49, 351 S.W.2d 385, 388 (1961). Accordingly, trial courts should give substantially accurate instructions concerning the law applicable to the matters at issue. **Street v. Calvert**, 541 S.W.2d 576, 584 (Tenn.1976). The instructions need not be perfect in every detail, **Davis v. Wilson**, 522 S.W.2d 872, 884 (Tenn.Ct.App.1974), as long as they are, as a whole, correct. **In re Elam's Estate**, 738 S.W.2d 169, 176 (Tenn.1987).

We find the court's charge on the third issue to be correct and sufficient.

There is another compelling reason, however, why we must affirm the trial court on both the second and third issues. It was the duty of the Appellant, at the trial, to call to the court's attention the objectionable portions of the charge to the jury about which he now complains and to submit to the court further and adequate charges to correct the portion of the charge now complained of. In the case of **Provence v. Williams**, 62 Tenn.App.371, 462 S.W.2d 885, 899, the court said:

> It is an established general rule in this state that a party must call the trial judge's attention to that part of the jury instructions which the party believes to be inadequate, equivocal or confusing, and to submit a request for additional instructions, if the party intends to predicate error upon meagerness of the charge or

possible ambiguity.  **Womac v. Casteel**, 200 Tenn. 588, 292 S.W.2d 782. (Emphasis ours.)

In the case of **Trentham v. Headrick**, 35 Tenn.App. 330, 245 S.W.2d 632, 635 (1950), the court said:

> Under our decisions inadequate instructions in a charge to the jury are not reversible error when the party affected thereby fails to call the error to the attention of the court, and when adequate and further instructions are not requested. [Citations omitted.] In considering this question our Supreme Court, in **Carney v. Cook**, supra [158 Tenn. 333, 13 S.W.2d 325], said:  "..., counsel engaged in a trial should aid the court by calling his attention to an abstraction or an inadvertence in delivering his instructions to the jury, and where they fail to do so, this court will not reverse unless convinced that the party complaining has been prejudiced by such instruction, or that justice is about to miscarry."

In the case of **Rule v. Empire Gas Corp.**, 563 S.W.2d 551 (Tenn.1978) our supreme court made is clear Rule 51.02, TRCP, did not alter the rule laid down in prior decisions that "counsel engaged in a trial should aid the court by calling his attention to an abstraction in delivering his instructions to the jury, and where they fail to do so, this court will not reverse unless convinced that the party complaining has been prejudiced by such instruction, or that justice is about to miscarry."  Id. 553.  The **Rule** court went on to say:

> We hold that Rule 51.02 of the Tennessee Rules of Civil Procedure has not abolished or altered the rule announced in the **Provence** and **Holmes** cases, supra, that in order to predicate error upon an alleged omission in the instructions given to the jury by the trial judge he must have pointed out such omission to the trial judge at trial by an appropriate request for instruction.

Id. 554.

In the later case of **Forde v. Fisk University**, 661 S.W.2d 883, 887 (Tenn.App.1983) this court, in addressing the issue, said:

14

Appellant next insists that the instructions to the jury were inadequate.  In such event, it is the duty of the complaining party to submit special requests for additional clarifying instructions; and failure to do so constitutes a waiver of the inadequacy.  **Rule v. Empire Gas Co.**, Tenn.1978, 563 S.W.2d 551.

We have been cited to no authority, nor have we found any, where the complaint of the court's charge was the same or similar to the complaint of the Appellant in his second issue.  The case we have found that appears to be related to the case at bar is the old case of **Malone v. Searight**, 76 Tenn. 91, 8 Lee 91 (1881) at 94, where the court said:

> The trial judge can not be put in error by the mere inaccurate use of words, not excepted to at the time, when we can see that it was intended to convey a correct rule, and could not, when taken in connection with the residue of the charge, having [sic] misled the jury. .... If the charge actually assume[s] as conceded a particular fact, it is the duty of the party to object to the assumption at the time.

The issues are found in favor of the Appellees.  The judgment of the trial court is affirmed.  The cost of this appeal is taxed to the Appellant and the case is remanded to the trial court for any further necessary proceedings.

_____
Clifford E. Sanders, Sp.J.


CONCUR:


_____
Herschel P. Franks, J.


_____
Don T. McMurray, J.